T.C. Memo. 2000-357


UNITED STATES TAX COURT


UNION GANADERA REGIONAL DE CHIHUAHUA, INC., Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 12521-98.          Filed November 16, 2000.


    <u>Elizabeth A. Copeland</u> and <u>Stanley L. Blend</u>, for
petitioner.

    <u>Elizabeth A. Owen</u>, for respondent.


        MEMORANDUM FINDINGS OF FACT AND OPINION

    JACOBS, <u>Judge</u>: Respondent made the following determinations,
which petitioner contests:

Re:  Federal Income Tax Deficiencies:

| Year | Deficiency |
|------|------------|
| 1992 | $74,225 |
| 1993 | 94,903 |

Re: Deficiencies For Withholding of Income Tax At Source and Additions to Tax:

| Year | Withholding Deficiency | Additions to Tax Sec. 6651(a)(1) | Sec. 6656 |
|------|------------------------|-----------------------------------|-----------|
| 1992 | $53,608 | $13,402 | $5,361 |
| 1993 | 107,107 | 26,777 | 10,711 |

All section references are to the Internal Revenue Code (the Code) in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

Following a concession by each party, we must decide whether petitioner, a U.S. corporation that owned and operated a cattle-crossing facility on the United States (U.S.) side of the U.S.-Mexican border, is entitled to deduct amounts paid to its Mexican parent company in 1992 and 1993 with respect to costs incurred by the parent company for inspection and bathing of cattle crossing the border.  If we conclude that the amounts are not deductible, then we must decide (1) whether petitioner's payments to its parent company constitute dividend payments, for which petitioner was required to withhold 30 percent pursuant to section 1442; (2) whether petitioner was required to file Federal withholding tax returns, Forms 1042, Annual Withholding Tax Return for U.S. Source Income of Foreign Persons, for 1992 and 1993; and (3) whether petitioner is liable for additions to tax pursuant to sections

6651(a)(1) and 6656 (with regard to the withholding of income tax at source).

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulations of facts and the attached exhibits are incorporated herein by this reference.

Background

Union Ganadera Regional de Chihuahua (Union Mexico) was a Mexican, nonprofit agricultural cooperative, established in 1936. It was organized to assist its members (namely, 43 individual cattle associations, totaling approximately 3,000 Mexican cattle ranchers) in the crossing of cattle from Mexico into the United States and vice versa. Union Mexico was the parent company of Union Ganadera Regional de Chihuahua, Inc. (petitioner), a New Mexico corporation organized in 1991. At all relevant times, petitioner maintained its principal place of business in Santa Teresa, New Mexico.

Petitioner assisted Union Mexico in the crossing of cattle over the U.S.-Mexican border. It employed eight individuals in conducting its cattle-crossing activities on the U.S. side of the border; whereas, Union Mexico employed 45 individuals in conducting its cattle-crossing activities on the Mexican side of the border.

The Cattle Export/Import Business

Prior to the establishment of petitioner's facilities, Union Mexico owned three cattle-crossing facilities in the State of Chihuahua, Mexico: Ciudad Juarez, Ojinaga, and Palomas.[1] At each of these facilities, cattle were inspected and bathed to rid the cattle of parasites (bathing) before crossing into the United States.

Before petitioner was incorporated, Union Mexico did not own any cattle-crossing facilities in the United States. Rather, cattle crossed into the United States from Mexico by way of unrelated, privately owned U.S. stockyards.[2]

Union Mexico organized petitioner to own and operate a cattle-crossing facility (the Santa Teresa facility) on the U.S. side of the U.S.-Mexican border directly across the border from its San Jeronimo facility. The Santa Teresa facility was located in Santa

---

[1]  At the time of trial, only the Ojinaga and Palomas facilities operated.

[2]  Kattle Kare, Inc., operated by Butch Stevens, owned a stockyard in Columbus, New Mexico, directly across the U.S. border from Union Mexico's Palomas facility. Prior to the construction of the San Jeronimo/Santa Teresa facility, the Palomas/Columbus cattle crossing was the predominant U.S.-Mexican cattle crossing. During the years in issue, Kattle Kare, Inc. charged $3.50 per head of cattle for crossing the border and 1 day of boarding (including hay for 1 day).
In addition, several privately owned corrals existed with respect to the Ojinaga facility (used to house the livestock on the U.S. side of the border).

Teresa, New Mexico, just outside the city limits of El Paso, Texas. It began its cattle-crossing operations in 1992.

The combined cattle-crossing facilities at San Jeronimo and Santa Teresa were integrated facilities, consisting of 92 acres that straddle the U.S.-Mexican border. Petitioner owned 39 percent of the total acreage (at Santa Teresa), and Union Mexico owned 61 percent (at San Jeronimo). To cross the U.S.-Mexican border, cattle walked approximately 120 feet from the San Jeronimo facility (in Mexico) to the Santa Teresa facility (in the United States).

The Santa Teresa facility, together with the San Jeronimo facility: (1) Provided efficiencies of scale for crossing cattle over the U.S.-Mexican border by providing an integrated cattle-crossing location; (2) improved the quality of the U.S. facilities that receive Mexican cattle; (3) reduced theft, stress, and weight loss of the cattle; and (4) reduced Union Mexico's losses in exporting cattle.

The San Jeronimo facility included a building with bathing facilities, cattle pens, weighing facilities, and offices. It housed Union Mexico's cattle-crossing operations and provided office space for U.S. Department of Agriculture (USDA) inspectors and their Mexican counterparts. At this location, Union Mexico coordinated (1) the receipt of cattle from the trucks, (2) the holding and feeding of cattle, (3) the weighing of cattle, (4) the inspection of cattle, (5) the bathing of cattle, and (6) the

corralling of cattle acceptable for export to the United States. The Santa Teresa facility included a building, sorting and weighing facilities, and cattle pens.

Petitioner accepted the USDA-approved cattle from the San Jeronimo facility and sorted and temporarily housed the cattle until a U.S. purchaser arrived.[3]  (Usually this occurred within 24 hours or less.)  Union Mexico provided all of petitioner's electricity and water.

The cattle generally spent 15 to 20 hours at the San Jeronimo facility and 8 hours at the Santa Teresa facility. Before the cattle left petitioner's facility, a customs broker (an independent contractor unrelated to petitioner or Union Mexico) collected fees from the Mexican rancher/seller, including a $3 fee for each head of cattle that crossed through the facility. Thereafter, the

---

[3]    The operations at the San Jeronimo/Santa Teresa facilities were as follows: (1)  A Mexican rancher delivered his cattle to one or more of the eight unloading docks at the San Jeronimo facility, at a scheduled date; (2) the cattle were counted, weighed, and then housed, fed, and watered; (3) the cattle rested for 6 to 12 hours; (4) Union Mexico's employees thereafter herded the cattle into inspection chutes where USDA inspectors and their Mexican counterparts inspected the livestock; rejected cattle remained in Mexico; (5) Union Mexico provided offices, water, and electricity free of charge to the USDA and Mexican inspectors; (6) the USDA-approved cattle were herded out of the inspection chutes into bathing pools, where the cattle were dipped fully in chemicals and sent to clean holding pens; (7) after the cattle were dried, they were moved through the Mexican corrals and herded on foot approximately 120 feet to petitioner's Santa Teresa facility; (8) here, the cattle were herded through chutes, reweighed, and housed in feeding/watering pens; and finally, (9) the cattle were loaded onto trucks for shipment to the U.S. buyer.

customs broker remitted the $3 per head of cattle fee to petitioner. (This fee also included the cost of necessary paperwork and feed for 1 day.) If the cattle remained overnight, petitioner charged an additional $6 fee for each bale of hay consumed.

Petitioner agreed to pay Union Mexico $1.50 of the $3 per head of cattle fee as petitioner's share of the water, electrical, inspection, and bathing expenses. This $1.50 per head of cattle fee was determined by estimating the costs Union Mexico incurred in connection with crossing the cattle into the Santa Teresa facility from the San Jeronimo facility and allocating one-half of these costs to petitioner. The financial arrangement between petitioner and Union Mexico was set forth in a January 2, 1993, contract[4].

---

[4] The contract, in relevant part, states:

FIRST.--Union Ganadera Regional de Chihuahua, as the party in charge of facilitating the export of cattle to the United States, is obligated to program deliveries of cattle through the San Jeronimo installations so that said cattle reach the stockyards of Union Ganadera Regional de Chihuahua, Inc. in Santa Teresa.

SECOND.--Union Ganadera Regional de Chihuahua is also obligated to provide Union Ganadera Regional de Chihuahua, Inc. various services that are necessary its [sic] effective operation and that are described as follows: Water, by means of extraction and pumping from a well located on the property of Union Ganadera Regional de Chihuahua that will be delivered to the piping to Union Ganadera Regional de Chihuahua, Inc. at the North American border; Electrical Energy, through adequate technical connections located in the installations of Union Ganadera Regional de Chihuahua Inc's. at the North American border; Sanitary

(continued...)

<u>Petitioner's Federal Income Tax Returns and the Notices of Deficiency</u>

On its 1992 Form 1120X, Amended U.S. Corporation Income Tax Return, petitioner claimed a $204,288 deduction for amounts it paid to Union Mexico. Respondent disallowed that portion of the claimed deduction (totaling $181,137) that related to payment for inspection and bathing costs but allowed that portion relating to Union Mexico's furnishing of water and electricity to petitioner.

---

[4](...continued)
<u>Inspection and Parasitical Bath</u>, required by the governments of both countries for the exportation of cattle, for the cattle that are exported to Santa Teresa, to be performed by its personnel in its installations at San Jeronimo.

THIRD.--As payment for the referenced services, Union Ganadera Regional de Chihuahua, Inc. is obligated to pay Union Ganadera Regional de Chihuahua the amount established by both parties as annexed to this agreement, for each head of cattle that is exported through the Sanitary Unit at San Jeronimo to the stockyeards [sic] at Santa Teresa.

The attachment to the contract states as follows:

In conformity with the THIRD CLAUSE of the contract, both parties agree on a charge of US$1.50 (ONE DOLLAR AND FIFTY CENTS) per head of cattle that crosses from the Sanitary Unit at San Jeronimo to the stockyards at Santa Teresa, New Mexico.

Subsequently, respondent reduced the disallowed amount to $178,694 to reflect an additional allowance of $2,443 for water and electricity costs.[5]

On its 1993 Form 1120, U.S. Corporation Income Tax Return, petitioner claimed a $397,519 deduction for amounts it paid to Union Mexico. Respondent again disallowed that portion (totaling $357,024) that related to payment for inspection and bathing costs.

Respondent disallowed the payment for inspection and bathing costs on the basis that the costs for these expenses were not properly allocable to petitioner, but rather were those of Union Mexico. As a consequence of this determination, respondent characterized petitioner's payments to Union Mexico as constructive dividends (representing a distribution of petitioner's earnings and profits to its foreign parent company).

Respondent further determined that petitioner should have withheld income tax at the source, pursuant to section 1442, with respect to purported dividends ($178,694 for 1992 and $357,024 for

---

[5] The following summarizes the processing fees adjustment for 1992:

| | |
|---|---|
| Total processing fees claimed: | |
|   Inspection, bathing, | |
|     water, and electricity | $204,288 |
| Processing fees allowed: | |
|   Water | 10,214 |
|   Electric | 12,937 |
| Processing fees disallowed: | |
|   Inspection, bathing | 181,137 |
| Additional allowance: | |
|   Water and electric | 2,443 |
| Disallowance | 178,694 |

1993).  Thus, respondent determined withholding deficiencies of $53,608 for 1992 and $107,107 for 1993.  Lastly, respondent determined that petitioner was liable for sections 6651(a)(1) and 6656 additions to tax.

ULTIMATE FINDINGS OF FACT

The amount petitioner paid Union Mexico with respect to the costs for inspection and bathing of cattle was an ordinary and necessary section 162 expense.

OPINION

Our task is to decide whether petitioner is entitled to deduct the payments it made to Union Mexico for costs of inspection and bathing of cattle crossing into the United States (at petitioner's Santa Teresa facility) from Mexico.  Petitioner maintains that these payments were ordinary and necessary business expenses. Respondent disagrees, and further argues that the disallowed fees represented disguised dividends paid by petitioner to its sole shareholder.  Respondent further maintains that inasmuch as the inspection and bathing processes occurred at Union Mexico's San Jeronimo facility prior to the cattle crossing into the United States, the fees for these expenses (insofar as petitioner is concerned) are neither customary nor appropriate.

The applicable Code provision is section 162(a), which provides that "There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business".  The test for

determining whether an expense is ordinary and necessary is whether a "hard-headed" businessperson, under the circumstances, would have incurred the expense. See, e.g., <u>Cole v. Commissioner</u>, 481 F.2d 872, 876 (2d Cir. 1973), affg. T.C. Memo. 1972-177. Because of the relationship between petitioner and Union Mexico,[6] the expenses at issue are subject to close scrutiny. See <u>Higgins v. Smith</u>, 308 U.S. 473 (1940).

In the case at bar, the record reflects that petitioner reimbursed Union Mexico for its share of the inspection and bathing expenses, and not for any nefarious reason. Petitioner's and Union Mexico's businesses were directly linked. The inspection and bathing expenses were shared business-related expenses, and petitioner and Union Mexico benefited equally from the inspection and bathing functions carried out by Union Mexico. The benefits derived from the inspection and bathing of cattle ensured the continued viability of petitioner's cattle-crossing business. Thus, we are satisfied that the entire amount petitioner paid to Union Mexico constituted an ordinary and necessary business expense. The inspection and bathing of cattle on the Mexican side of the border was required before petitioner could import the cattle into the United States. Petitioner's revenues were based on the flow of USDA-approved cattle originating in Mexico to U.S. buyers.

---

[6] The parties agree that sec. 482 is not at issue.

We reject respondent's argument that the costs Union Mexico incurred for inspection and bathing of the cattle are strictly Union Mexico expenses (which should not be passed on to petitioner). The cattle-crossing operation was an integrated operation. Petitioner paid Union Mexico the disputed fees for its share of the expenses incurred to perform necessary activities in the ordinary course of its business.

To conclude, the expenses at issue were critical and indispensable to petitioner's business and therefore were ordinary and necessary business expenses. Accordingly, we hold that the expenses relating to the costs of inspection and bathing of cattle in Mexico were properly deductible as ordinary and necessary business expenses and did not constitute constructive dividends. Because of this holding, the remaining issues go by the wayside.

In reaching our holding, we have considered all of the arguments presented and, to the extent not discussed above, find them to be irrelevant or without merit.

To reflect the foregoing and the parties' concessions,

Decision will be entered under Rule 155.